IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| TROY L. PARKER, | ) | CASE NO. 3:13-cv-01810 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Troy L. Parker ("Plaintiff" or "Parker") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation.

As discussed more fully below, the Administrative Law Judge's explanation of the weight provided to the opinions of Parker's treating psychiatrist falls short of satisfying the treating physician rule. Further, in light of the fact that the ALJ provided some, albeit little, weight to Parker's treating psychiatrist's opinions, which included marked or extreme mental work-related limitations, the ALJ did not adequately explain his Step Two finding that Parker's mental impairments were non-severe. Accordingly, the Commissioner's decision should be **REVERSED** and **REMANDED**.

1

# I. Procedural History

On or about April 20, 2010, Parker filed applications for DIB and SSI.[1] Tr. 45, 57, 100, 169. He alleged a disability onset date of July 1, 2007.[2] 11, 45, 57, 250. He alleged disability based on depression, anxiety, panic attacks, and severe neck pain (Tr. 45, 57, 71, 83, 131, 134, 142, 146, 149, 153). After initial denial by the state agency (Tr.131-133, 134-137), and denial upon reconsideration (Tr.142-145, 146-148, 149-152, 153-155), Parker requested a hearing (Tr. 156-160). An administrative hearing was held before ALJ Christopher B. McNeil on December 1, 2011. Tr. 9-40.

In his February 1, 2012, decision, the ALJ determined that Parker had not been under a disability from July 1, 2007, through the date of the ALJ's decision. Tr. 97-116. Parker requested review of the ALJ's decision by the Appeals Council. Tr. 8. On June 17, 2013, the Appeals Council denied Parker's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

## A.     Personal, educational and vocational evidence

Parker was born in 1965. Tr. 45, 57, 169. At the time of the hearing, Parker was living with his mother and stepfather. Tr. 17. He had attended regular classes in school and graduated from high school. Tr. 17. Parker worked for Whirlpool as an assembler for approximately 14

---

[1] Parker had previously filed for social security disability benefits in 2008 (Tr. 41-42, 187-190) and 2009 (Tr. 43-44, 219-222). Those applications were denied. Tr. 41-42, 43-44, 117-123, 124-130. During the hearing, the Administrative Law Judge ("ALJ") indicated that Parker had made a request to reopen the applications previously filed on May 12, 2008, and February 29, 2009, and that those applications had been reopened. Tr. 11.

[2] During the hearing, the ALJ stated that Parker alleged a disability onset date of May 30, 2008, after initially alleging an onset date of July 1, 2007. Tr. 11. Notwithstanding this statement, in his decision, the ALJ refers to an alleged onset date of July 1, 2007 (Tr. 100, 102, 108), and the Commissioner in her brief refers to an alleged onset date of July 7, 2007 (Doc. 15, p. 2). Plaintiff does not refer to an alleged onset date in his brief.

years.[3]  Tr. 18-19.   While at Whirlpool, Parker assembled drums for clothes dryers.[4]  Tr. 19.

Parker left Whirlpool in July 2007.  Tr. 21.  He indicated that his job had become too stressful.

Tr. 20-21.

**B.     Medical evidence[5]**

Parker first received mental health treatment in 2002.  Tr. 333-337, 340-351.  On July 5,

2002, Dr. Lalith K. Misra, D.O., Ph.D., conducted a psychiatric evaluation of Parker.  Tr. 334-

336.  Dr. Misra diagnosed Parker with major depressive disorder, recurrent severe; posttraumatic

stress disorder, moderate to severe; and generalized anxiety disorder.  Tr.336.  Thereafter, on

October 22, 2002, he was evaluated by Dr. Bipin Desai, M.D.  Tr. 340-341.  Dr. Desai's

diagnoses included major depressive disorder, moderate, recurrent.  Tr. 341.  Parker continued

treatment with Dr. Desai intermittently through 2007.  Tr. 342-350, 643-645, 646-648, 649-652.

On March 29, 2008, Parker presented to the Marion General Hospital complaining that

his heart was racing and skipping beats.  Tr. 360.  Parker reported that his symptoms were

aggravated by anxiety.  Tr. 360.  He reported that he had been taking medication for anxiety and

depression but had stopped because he thought he did not need the medication anymore.  Tr.

360.  Parker was discharged home with an impression of "Palpitations Sinus Tachycardia,

Anxiety Reaction."  Tr. 360.  On May 21, 2008, Parker presented to Marion General Hospital

with complaints of chest pain.  Tr. 352.  An emergency room treatment note indicates that Parker

had an "anxiety component [to his] condition."  Tr. 356.

---

[3] His most recent job had been a temporary position at a tax office that involved filing and sorting papers.  Tr. 18. That job did not last longer than three months.  Tr. 18.

[4] Also, towards the end of his employment with Whirlpool, Parker worked as a trainer, training new employees how to do simple jobs.  Tr. 19.

[5] Parker's arguments relate to his alleged mental impairments, with the focus of his arguments being based on the weight the ALJ afforded his treating psychiatrist Dr. Stephen J. Bittner, M.D.

On May 30, 2008, Dr. Don McIntire, M.D., completed a Mental Functional Capacity Assessment.  Tr. 386-387.  Dr. McIntire indicated that Parker was "alert and in contact with the examiner, throughout the examination, with no lapses of attention or confusion."  Tr. 387.  Dr. McIntire also indicated that Parker "presented as anxious as he was physically nervous and somewhat tremulous.  He worries obsessively about many things, leading to insomnia and accompanied by feelings of impending doom . . . He has random panic attacks on almost a daily basis.  These worsen in severity and frequency if he is around other people, with the result that he has been isolating himself.  He feels depressed and is easily upset and aggravated."  Tr. 387.  Parker's fund of knowledge was good and his judgment was fair.  Tr. 387.  Parker reported problems with short-term memory and concentration but not with long-term memory.  Tr. 387.  As part of the Mental Functional Capacity Assessment, Dr. McIntire rated Parker in 20 categories.  Tr. 386.  He rated Parker markedly limited in 6 categories; moderately limited in 3 categories; and not significantly limited in 11.  Tr. 386.  Dr. McIntire checked a box noting that Parker's limitations were expected to last between 30 days and 9 months.  Tr. 386.

On August 11, 2008, Dr. Sudhir Dubey, PsyD., conducted a consultative examination. Tr. 395-400.  Dr. Dubey opined that Parker had generalized anxiety disorder and indicated that Parker had no work-related mental limitations.  Tr. 399-400.

On September 1, 2008, Dr. Caroline Lewis, Ph.D., completed a Psychiatric Review Technique wherein she opined that Parker's mental impairments were not severe.  Tr. 402-415. She relied upon Dr. Dubey's consultative opinion noting that it was "the only current acceptable psych source."  Tr. 414.

On January 19, 2009, Parker presented to Marion General Hospital complaining of chest pain and anxiety.  Tr. 542.  Parker reported that he had taken a Xanax but it did not seem to

work. Tr. 542. He was discharged home in stable condition with an impression of "Adjustment Disorder w/Anxiety, Atypical Chest Pain." Tr. 542.

On April 28, 2009, Dr. T. Rodney Swearingen, Ph.D., conducted a consultative examination. Tr. 470-474. Dr. Swearingen's diagnoses included depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and posttraumatic stress disorder. Tr. 473. With respect to the four work-related mental abilities, Dr. Swearingen opined that Parker was mildly impaired in his ability to relate to others, including co-workers and supervisors, and in his ability to withstand stress and pressure associated with daily work activity; and he had no impairment in his ability to understand, remember and follow instructions[6] or maintain concentration, persistence and pace. Tr. 473-474.

On May 18, 2009, Dr. Tasneem Khan, Ed.D., completed a Psychiatric Review Technique wherein he opined that Parker's mental impairments were not severe. Tr. 475-489. He opined that Parker had mild limitations in activities of daily living, social functioning, and concentration, persistence or pace. Tr. 485. Dr. Kahn concluded that Dr. McIntire's evaluation was not consistent with the medical evidence and was dated by about one year. Tr. 487. Therefore, he did not provide weight to that opinion. Tr. 487. Dr. Khan also noted that Dr. Dubey had examined Parker and found no limitations. Tr. 487.

On September 16, 2009, Parker presented to Marion General Hospital complaining of chest pains. Tr. 528. Parker was discharged in stable condition with the impression of "Chest Wall Pain." Tr. 528.

---

[6] Dr. Swearingen noted that he had not formally assessed Parker's ability to understand, remember and follow instructions but assessed it as not impaired because he had no problems following instructions at his previous job. Tr. 473.

On November 5, 2009, a licensed social worker with the North Community Counseling Center assessed Parker and completed an Adult Diagnostic Assessment.[7] Tr. 558-565.  She summarized that Parker presented with symptoms of depression and anxiety; reported that he felt hopeless, had trouble sleeping, cried for no reason, and lacked an appetite; had suicidal ideation but denied attempts or plans; reported loss of family or friends in a relatively close period of time; reported that he did not like leaving the house, was nervous around crowds, did not like going places alone, had panic attacks and was obsessed with cleaning.  Tr. 564.  Parker was diagnosed with major depressive disorder, recurrent, moderate and panic disorder with agoraphobia.  Tr. 564.  Medication and counseling were recommended.  Tr. 564.

On December 31, 2009, Parker presented to Marion General Hospital complaining of a racing heart and shortness of breath.  Tr. 519.  Parker was discharged with an impression of "Palpitations, Premature Ventricular Contractions (PVC), Anxiety Reaction."  Tr. 519.

On January 4, 2010, Dr. Stephen Bittner, M.D., completed an Initial Psychiatric Evaluation. Tr. 566-569.  Dr. Bittner noted that Parker's mood was depressed and anxious and his affect was constricted.  Tr. 568.   With respect to whether Parker was aggressive, Dr. Bittner noted "road rage." Tr. 567.  Dr. Bittner also noted that Parker was cooperative with no impairment in his cognition, including orientation, memory, attention/concentration and ability to abstract.  Tr. 568.  With respect to Parker's insight/judgment, Dr. Bittner noted that Parker "knows he's ill & needs treatment." Tr. 568.  Dr. Bittner also stated that Parker was neat and pleasant, looked younger than his age, and was eager for help.  Tr. 568.  Dr. Bittner diagnosed panic disorder with agoraphobia; major depressive disorder, recurrent, and obsessive compulsive disorder. Tr. 568.  Dr. Bittner increased Parker's medication.  Tr. 569.  Dr. Bittner continued to

---

[7] The licensed social worker's name is not entirely legible.  Tr. 564-565.  The social worker's last name appears to be Palmer.  Tr. 564-565.

treat Parker through 2011, with Parker reporting some improvement at times but reporting at other times that his condition was worsening.  Tr. 570-583, 632-638.

After an August 19, 2010, visit, Dr. Bittner completed a Mental Functional Capacity Assessment wherein he rated Parker in 20 categories.  Tr. 548.  He rated Parker markedly limited in 9 categories; moderately limited in 8 categories; and not significantly limited in 3 categories. Tr. 548.  In the narrative section of the Mental Functional Capacity Assessment, Dr. Bittner noted that Parker was neatly dressed and groomed; his mood was depressed and his affect was constricted; he was highly anxious with severe agoraphobia; he had no intellectual impairment other than poor attention and concentration secondary to anxiety and depression; he had no evidence of thought disorder, paranoia or delusions; and no evidence of substance abuse.  Tr. 549.

On September 13, 2010, Dr. Dubey conducted a second consultative examination. Tr. 551-556.  His diagnoses included dysthymic disorder and anxiety disorder, not otherwise specified.  Tr. 555.  He concluded that Parker had no impairment in any work-related mental abilities.  Tr. 556.

On October 4, 2010, state agency reviewing psychological consultant Dr. William Benninger, Ph.D., reviewed the record and opined that Parker had affective disorder and an anxiety-related disorder but concluded neither was severe and that Parker had no restrictions in activities of daily living, social functioning, or maintaining concentration, persistence or pace.[8] Tr. 50.

On February 17, 2011, Parker presented to Marion General Hospital complaining of chest pain and was discharged with the impression of "Chest Wall Pain."  Tr.593.

---

[8] On February 3, 2011, state agency reviewing psychological consultant Dr. Paul Tangeman, Ph.D., offered an opinion similar to that of Dr. Benninger.  Tr. 76.

On May 27, 2011, Dr. Bittner completed a Mental Impairment Questionnaire.  Tr. 610-615.  Dr. Bittner noted that he had been treating Parker since January 4, 2010, every 1-2 months.  Tr. 610.  His diagnoses included panic disorder with agoraphobia; major depression, recurrent; and obsessive compulsive disorder.  Tr. 610.  He stated that Parker's treatment had included medication and psychotherapy with a fair response but many continuing symptoms.  Tr. 610.  Dr. Bittner reported that Parker continued to have severe agoraphobia and frequent panic and sub-panic attacks.  Tr. 610.  He noted that Parker was oriented, not psychotic, and did not suffer from substance abuse.  Tr. 610.  Dr. Bittner opined that Parker's prognosis was "unclear at this point."  Tr. 610.  Dr. Bittner identified a number of symptoms on a checklist form, including decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; and emotional withdrawal or isolation.  Tr. 611.

Dr. Bittner also rated Parker's mental ability and aptitude to perform various types of work.[9]  Tr. 612-614.  In the "unskilled work" section, Dr. Bittner opined that Parker had "no useful ability to function" in 5 categories, was "unable to meet competitive standards" in 4 categories, was "seriously limited, but not precluded" in 3 categories, and "limited but satisfactory" in 4 categories."  Tr. 612.  In the "semiskilled and skilled work" section, Dr. Bittner opined that Parker had "no useful ability to function" in all 4 categories.  Tr. 612.  In the "particular types of jobs" section, Dr. Bittner opined that Parker had "no useful ability to function" in 4 categories and "limited but satisfactory" ability in 1 category.  Tr. 613.

Dr. Bittner also separately rated Parker as markedly limited in his ability to perform activities of daily living and maintain concentration, persistence or pace and extremely limited in

---

[9] The form used to rate Parker's ability and aptitude contains three sections:  I - Mental abilities and aptitudes need to do unskilled work; II - Mental abilities and aptitudes needed to do semiskilled and skilled work; and III - Mental abilities and aptitudes to do particular types of jobs.  Tr. 612-613.  In Section III, there is no description of "particular types of jobs."  Tr. 613.

maintaining social functioning.  Tr. 613.  Dr. Bittner opined that, on average, Parker's impairments or treatment would cause him to be absent from work more than 4 days per month and indicated that the restrictions and limitations contained in his assessment were present since 2007.  Tr. 615.

**C.     Testimonial evidence**

**1.     Plaintiff's testimony**

Parker testified at the administrative hearing.  Tr. 17-34.   He indicated that he started seeing a psychiatrist around 2002, shortly after his dad had died.  Tr. 21.  He was feeling very down and depressed.  Tr. 21-22.  He did not have very many friends.  Tr. 22.

At Whirlpool, he was a team leader and his supervisor was always on him if they were not meeting production.  Tr. 20-21.  He eventually became so stressed and nervous that he was not showing up for work.  Tr. 20-21, 23.   Also, while working, he would get in arguments with co-workers a couple of times a week over little things.  Tr. 34.  To relieve some of his anxiety and stress, his doctor would take him off work for a week or two and sometimes for three weeks.  Tr. 22.  Whirlpool accommodated his doctor's request for time off.  Tr. 23.  Even with the ability to take some time off because of his stress and anxiety, Parker stopped working in 2007.  Tr. 23.

With respect to his depression, Parker indicated that he often has no desire to do anything.  Tr. 23-24.  He is not interested in anything.  Tr. 24.  He stated that he could not remember the last time he laughed about something.  Tr. 24.  He is just very unhappy with himself and feels as though he has wasted his life.  Tr. 24, 32-33.  He has never really done anything that he has wanted to do.  Tr. 24, 32-33.  He has crying spells on a daily basis.  Tr. 24.  He has had suicidal thoughts.  Tr. 32-33.  Parker does not like being around crowds because he

starts having panic attacks.  Tr. 24-25.  Usually, he only leaves the house to attend doctor appointments or go to the Post Office.  Tr. 24.  Sometimes he joins his mother for a walk through the park.  Tr. 24.  When he gets panicky, his palms get sweaty, his heart races, he is short of breath, and he feels lightheaded.  Tr. 25.  He has panic attacks usually every two to three days.  Tr. 25.  If he avoids crowds, he still might have panic attacks but they are real mild.  Tr. 25.

He has a difficult time sleeping.  Tr. 26.  He is able to fall asleep but only sleep for about an hour or two and then has trouble falling back asleep.  Tr. 26.  Medication that his doctor has prescribed to help him sleep has worked pretty well but he is still not able to sleep all the way through the night like he used to.  Tr. 26.

Parker has gone to the emergency room on different occasions because he felt like he was having a heart attack.  Tr. 27-28.   At different times, his heart was really racing, he was really short of breath and lightheaded, and felt like he was going to pass out.  Tr. 27.  His family doctor, Dr. Aurora, sent Parker to a neurologist to have an EEG done.  Tr. 26, 28.  His doctor advised him that the EEG was okay and that his anxiety was causing his symptoms.  Tr. 28.

Parker has also been diagnosed with obsessive compulsive disorder.  Tr. 28.  Parker indicated that he is a clean freak.  Tr. 28-29.  He does not like touching doors that a lot of other people have touched.  Tr. 29.  He usually carries a handkerchief in his pocket and is constantly washing his hands.  Tr. 29.

He takes a number of different medications for his mental impairments, including Effexor, an anti-depressant; Xanax for his anxiety and panic attacks; Clonidine to help him sleep; and Temazepam for insomnia.[10] Tr. 31.  Some of his medications make him feel lightheaded, dizzy, and/or spaced out or unable to focus.  Tr. 31.

---

[10] He also takes a blood pressure medication.  Tr. 31.

In addition to discussing his mental impairments, Parker discussed his neck problems. Tr. 29.  He reported that he first started having neck problems about six or seven years prior to the hearing.  Tr. 29.  The pain starts around the back of his ear and goes about halfway down the middle of his neck and shoulder.  Tr. 30.  He described the pain as a dull pain, like a really hard grip on his neck and shoulder.  Tr. 30.  Because of his neck pain, he does not drive a lot.  Tr. 30. He started receiving chiropractic treatment and then started going to the Polaris Orthopedic Spine Center for injections.  Tr.  29.  The injections relieved his pain a little but the pain would come back after about a month.  Tr. 29.  He indicated that his neck hurts all the time.  Tr. 29. Sometimes he takes regular aspirin or Tylenol for the pain but he does not take anything else because he is allergic to a lot of things.  Tr. 29-30.  For example, he is allergic to Ibuprofen and morphine.  Tr. 29.

Parker described a typical day as waking up; having some decaffeinated coffee; reading the newspaper at the dining room table; washing dishes, if they need to be washed; watching some television; and reading.  Tr. 32.  His stepfather usually mows the lawn.  Tr. 32.  He likes to cook and, before his depression, anxiety and neck pain, he used to cook a lot more than he does now.  Tr. 32.  Now, he cooks simple meals once in a while.  Tr. 32.

### 2.    Vocational expert's testimony

Vocational Expert George W. Coleman, III ("VE") testified at the hearing.  Tr. 34-39. The VE described Parker's past work as including work as (1) a file clerk, a semi-skilled, light level position; and (2) assembly worker inspector, an unskilled, light level position.[11]  Tr. 36-37.

---

[11] Based on Parker's hearing testimony, the VE indicated that Parker performed the assembly worker position at the light level.  Tr. 37.  However, the VE noted that, based on information in the written record, he would opine that Parker performed that position at the medium level.  Tr. 37 (noting that Exhibit 3E showed that the heaviest weight Parker lifted while performing the assembly worker position was 50 pounds).

For the first hypothetical, the ALJ asked the VE to assume an individual with the same education and past relevant work as Parker who can occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; push or pull to the same extent using hand or foot controls; stand or walk about 6 hours and sit about 6 hours in an 8-hour workday; and cannot climb ladders, ropes, or scaffolds.  Tr. 37-38.   The VE indicated that the described individual would be able to perform both of Parker's past jobs.  Tr. 38.

For the second hypothetical, the ALJ asked the VE to add the following limitations to the first hypothetical due to mental impairments – the work must be simple and repetitive, requiring sustained attention for periods of up to 2 hour segments, with not more than occasional contact with supervisors, coworkers or the general public, and without fast-paced or strict time production pressures.  Tr. 38.  With those additional limitations, the VE indicated that the described individual would be unable to perform Parker's past jobs.  Tr. 38.  The VE also indicated that, with those mental limitations, the described individual would be unable to perform the essential functions of unskilled, sedentary work.  Tr. 38-39.

For the third hypothetical, the ALJ asked the VE to assume an individual who can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; push or pull to the same extent using hand or foot controls; stand or walk about 6 hours and sit about 6 hours in an 8-hour workday; cannot climb ladders, ropes, scaffolds; cannot stoop more than occasionally; cannot climb ramps or stairs more than frequently; cannot kneel, balance, crouch or crawl more than frequently; and cannot bilaterally reach overhead more than occasionally.  Tr. 39.  The VE indicated that Parker's past work would not be available to the described individual.  Tr. 39. However, there were other unskilled positions that the individual could perform, including (1) laundry aid, an unskilled, light level position with 1,211 jobs available regionally and 239,950

available nationally; (2) storage facility rental clerk, an unskilled, light level position with 990 jobs available regionally and 147,450 nationally; and (3) mail sorter, an unskilled, light level position with 305 jobs available regionally and 29,580 nationally.  Tr. 39.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[12] claimant is presumed disabled without further inquiry.

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[13] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his February 1, 2012, decision, the ALJ found that:[14]

1.    Parker meets the insured status requirements through June 30, 2013.  Tr. 102.

2.    Parker has not engaged in substantial gainful activity since July 1, 2007, the alleged onset date.  Tr. 102.

3.    Parker has the following severe impairments: degenerative disc disease of the cervical spine and stable angina.  Tr. 102.  The following impairments are non-severe: obstructive lung defect, emphysema, chronic tension headaches, depression, anxiety, panic disorder, obsessive compulsive disorder, and post-traumatic stress disorder.  Tr. 103-105.

---

[13] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[14] The ALJ's findings are summarized herein.

4.    Parker does not have an impairment or combination of impairments that meets or medically equals a listed impairment, including Listings 1.04 (Disorders of the Spine), 12.04 (Affective Disorders), and 12.06 (Anxiety-related disorders).  Tr. 105.

5.    Parker has the RFC to perform light work with the following abilities and limitations: (1) able to lift or carry 20 pounds occasionally and 10 pounds frequently; (2) able to push or pull to the same extent with hand or foot controls; (3) able to stand or walk for about 6 hours in an 8-hour workday; (4) able to sit about 6 hours in an 8-hour workday; (5) precluded from climbing ladders, ropes, or scaffolds; (6) limited to no more than occasional stooping; (7) limited to no more than frequent climbing of ramps or stairs; (8) limited to no more than frequent kneeling, balancing, crouching, crawling, and bilaterally reaching overhead.  Tr. 105-107.

6.    Parker is unable to perform any past relevant work.  Tr. 106.

7.    Parker was born in 1965, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 107.

8.    Parker has at least a high school education and is able to communicate in English.  Tr. 107.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 107.

10.   Considering Parker's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Parker can perform, including laundry aide, storage facility rental clerk, and mail sorter.  Tr. 107-108.

Based on the foregoing, the ALJ determined that Parker had not been under a disability from July 1, 2007, through the date of the decision.  Tr. 108.

## V. Parties' Arguments

### A.    Plaintiff's arguments

First, Parker argues that the ALJ violated the "treating physician rule" by failing to provide controlling weight to the August 19, 2010, and May 27, 2011, opinions of his treating

psychiatrist, Stephen J. Bittner, M.D., and/or by not properly considering the factors set forth in 20 C.F.R. § 416.927. Doc. 14, pp. 11-18.

Second, Parker argues that the ALJ erred at Step Two by finding that his depression, anxiety, panic disorder, obsessive compulsive disorder, and post-traumatic stress disorder were non-severe. Doc. 14, pp. 18-19. Parker contends that there is evidence to support a finding that his mental impairments are severe.[15] Doc. 14, pp. 18-19.

## B. Defendant's arguments

In response to Parker's treating physician arguments, the Commissioner argues that the ALJ reasonably assigned to Dr. Bittner's medical opinions the weight that the ALJ deemed appropriate based on factors such as whether the opinion was consistent with Dr. Bittner's treatment records and the record as a whole. Doc. 15, pp. 11-18. The Commissioner argues that the ALJ's treatment of Dr. Bittner's opinions is supported by the findings and opinions of various medical providers, Parker's activities of daily living, and the fact that Parker worked during the relevant period. Doc. 15, pp. 12-15. The Commissioner also argues that Dr. Bittner provided very little support for his extreme findings; Dr. Bittner's opinions were inconsistent with the longitudinal record and Dr. Bittner's own findings; and Dr. Bittner's opinions were inconsistent with the record because Parker worked notwithstanding his alleged impairments. Doc. 15, pp. 15- 18.

With respect to Parker's Step Two argument, the Commissioner argues that clinical findings and medical opinion evidence support the ALJ's finding that Parker's mental impairments did not significantly limit his abilities to perform basic work activity. Doc. 15, pp.

---

[15] Parker acknowledges that an ALJ's finding that a claimant's impairment is not severe can be harmless error where an ALJ finds one severe impairment and considers both severe and non-severe impairments in assessing the RFC. Doc. 14, p. 19. However, Parker argues that in his case, the ALJ included no psychological limitations in the RFC and therefore the ALJ's error cannot be harmless. Doc. 14, p. 19.

18-19.  Additionally, the Commissioner argues that Parker's activities of daily living and work record during the relevant period provide support for the ALJ's Step Two finding.  Doc.15, pp. 19-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20*03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 19*92) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 19*89).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 20*06) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or, indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 20*03).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 19*84).

**A.**     **The ALJ failed to adequately explain the weight provided to Parker's treating psychiatrist Dr. Bittner**

The ALJ provided "little weight" to Dr. Bittner's August 19, 2010, and May 27, 2011, opinions.  Tr. 107.  The ALJ concluded that Dr. Bittner's opinions were "wildly inconsistent

with and not supported by" the ALJ's analysis "regarding the four broad functional areas set out in the disability regulations for evaluating mental disorders." Tr. 107. Parker contends that the ALJ's conclusions with respect to Dr. Bittner's opinions are flawed because, when the ALJ evaluated the four broad functional areas, the ALJ cherry-picked the evidence that supported the ALJ's conclusion. Doc. 14, pp. 11-18. Additionally, Parker argues that, even though the ALJ did not provide controlling weight to Dr. Bittner's opinions, the ALJ did not properly weigh Dr. Bittner's opinions in accordance with the factors set forth in 20 C.F.R. § 416.927. Doc. 14, pp. 11-18.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

The Commissioner's regulations impose a clear duty on an ALJ always to give good reasons in a notice of determination or decision for the weight given to treating source opinions. *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that

18

his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544). Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

Where a treating source's opinion is not provided controlling weight, certain factors must be applied by the ALJ to determine what weight should be given to the treating source's opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007). The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion. *Bowen*, 478 F.3d at 747; 20 C.F.R. § 404.1527(c).

At Step Two, the ALJ evaluated Parker's mental impairment claim, analyzed the evidence, and concluded that Parker had *no* limitations in activities of daily living, social functioning, and concentration, persistence or pace and therefore his mental impairments were non-severe impairments. Tr. 103-105. Later, as part of his RFC analysis, the ALJ relied on his Step Two analysis as the basis for providing little weight to Dr. Bittner's opinions (Tr. 107). The ALJ relied on the following medical evidence or reports: (1) Dr. Sudhir Dubey's August 11, 2008, and September 13, 2010, consultative reports (Exhibit 7F, Tr. 395-401; Exhibit 21F, Tr. 551-557); (2) Dr. T. Rodney Swearingen's April 28, 2009, consultative report (Exhibit 13F, Tr. 470-474); (3) North Community Counseling Center treatment records dated November 5, 2009,

through December 6, 2010 (Exhibit 22F, Tr. 558-586);[16] (4) state agency reviewing

psychological consultants' assessments dated September 1, 2008 (Exhibit 8F, Tr. 402-415) and

May 18, 2009 (Exhibit 14F, Tr. 475-488); and (5) Dr. Don McIntire's May 8, 2008,  Mental

Functional Capacity Assessment (Exhibit 6F, Tr. 385-394).  Tr. 103-105.  The ALJ also relied

upon disability and function reports.  Tr. 103-105 (referencing Exhibits 2E, 4E, 10E and 14E).

While the ALJ reviewed, considered and relied upon a significant amount of evidence to

support his decision to provide little weight to Dr. Bittner's opinions and find *no* severe mental

impairment, missing from the ALJ's analysis is a discussion of other evidence that is not "wildly

inconsistent" with Dr. Bittner's opinions.  For example, Dr. Bipin Desai, M.D., treated Parker

beginning in 2002 and supported Parker's requests for medical leaves from work in 2006 and

2007 because of depression and anxiety.  Tr. 340-350, 643-645, 646, 649.   Also, the ALJ relied

upon Dr. McIntire's Mental Functional Capacity Assessment to support his conclusion that

Parker had no limitations in social functioning and had no limitations in concentration,

persistence or pace.  Tr. 104 (referencing Exhibit 6F to support his conclusions).  However,

included in that same Mental Functional Capacity Assessment are notes, not discussed by the

ALJ, that are consistent with Parker's mental impairment claim, including Dr. McIntire's note

that Parker "presented as anxious as he was physically nervous and somewhat tremulous."[17] (Tr.

387).

There is a stark contrast between Dr. Bittner's opinions of marked or extreme mental

limitations and the ALJ's finding that Parker had *no* severe mental impairments.  Although it is

---

[16] Exhibit 22 includes an Adult Diagnostic Assessment (Tr. 558-565) and treatment notes from Dr. Bittner (Tr. 566-583).  The ALJ did not make entirely clear what portions of Exhibit 22 he was relying upon to support his conclusions that Parker had no mental limitations.  Tr. 103-105.

[17] Although the ALJ relied upon Dr. McIntire's opinion to support his Step Two determination, the ALJ later concluded that Dr. McIntire's assessment was also "wildly inconsistent" with the ALJ's analysis of the four broad functional areas and entitled to little weight.  Tr. 107.

the duty of the ALJ to weigh the medical evidence and it is not necessary for an ALJ to discuss every piece of medical evidence, the ALJ should have more fully explained how the ALJ considered and accounted for other evidence within the record that tended to support Parker's claim when he concluded that Dr. Bittner's opinions were "wildly inconsistent" with the record and therefore not entitled to controlling weight.  *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (finding error with an RFC assessment where the ALJ had selectively included only those parts of a report that showed the claimant to be capable).

Assuming that the ALJ considered all relevant evidence and properly determined that Dr. Bittner's opinions were inconsistent with other substantial evidence and therefore not entitled to controlling weight, the ALJ was still obligated to weigh Dr. Bittner's opinion by considering the factors in 20 C.F.R. § 404.1527(c) and provide good reasons for the weight provided.

The Commissioner argues that the ALJ properly provided little weight to Dr. Bittner's opinions because Dr. Bittner provided very little support for his conclusions and/or Dr. Bittner's opinions were not consistent with his own findings, which are relevant factors under 20 C.F.R. § 404.1527(c).  Doc. 15, pp. 15-17.  However, in explaining the weight provided to Dr. Bittner's opinions, the ALJ stated only that Dr. Bittner's opinions were "wildly inconsistent" with the ALJ's analysis of the record evidence.  Tr. 107.  The ALJ did not conclude that Dr. Bittner's opinions were entitled to little weight because he failed to provide support for his conclusions or that Dr. Bittner's opinions were inconsistent with his own findings. Therefore, the Commissioner's argument amounts to improper *post hoc rationalization*.  *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App. 181, 192 (6th Cir. 2009) (a reviewing court must assess the propriety of the administrative agency's action on the grounds invoked by the agency) (citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196 (1947)).  Moreover, Dr. Bittner did provide medical

findings to support his conclusions.  549, 610.  For example, Dr. Bittner supported his 2010 opinion with mental status exam findings, including that Parker's mood was depressed and his affect was constricted; he was highly anxious with severe agoraphobia; he had poor attention and concentration secondary to anxiety and depression.  Tr. 549.

Additionally, as reflected in Dr. Bittner's May 27, 2011, opinion, he had been treating Parker since January 4, 2010, every 1-2 months.  Tr. 610, 615.  However, the ALJ did not explain whether or how he considered the length of the treatment relationship and the frequency of Dr. Bittner's examinations and/or the nature and extent of Dr. Bittner's treatment relationship. *See* 20 C.F.R. §  404.1527(c)(2)(i)-(ii) (factors to consider include length of the treatment relationship, frequency of the examination, and nature and extent of the treatment relationship). Although the ALJ recognized that Dr. Bittner was a psychiatrist, it is unclear whether or how the ALJ factored Dr. Bittner's specialization into the weight he provided to Dr. Bittner's opinions. *See* 20 C.F.R. § 404.1527(c)(5) (specialization is another factor to be considered when weighing an opinion that is not provided controlling weight).

Although the ALJ was not required to provide an exhaustive factor-by-factor analysis of each of the factors in 20 C.F.R. § 404.1527(c) and while the ALJ discussed one of the factors, i.e., consistency,[18] the ALJ did not clearly consider other factors under 20 C.F.R. § 404.1527(c) that were potentially favorable to Parker, i.e., supportability, length of treatment relationship, frequency of the examination, and specialization.  Without a more thorough and reasoned analysis of the weight the ALJ provided to Dr. Bittner's opinions which makes clear that factors other than consistency with the record as a whole were considered, the Court is unable to conduct a meaningful review in order to determine whether the ALJ's reasons for providing little

---

[18] Consistency of an opinion with the record as a whole is one factor under 20 C.F.R. § 404.1527(c) but it is not the only factor.  *See* 20 C.F.R. § 404.1527(c)(1)-(6).

weight to Dr. Bittner's opinions were "good reasons" and whether the decision is supported by substantial evidence.[19]  *Cole*, 661 F.3d at 939-940 (An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.") (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  This is so even though Parker may appear to have little chance of success on the merits. *See Wilson*, 378 F.3d at 546-547 (a failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits.) Accordingly, although a more thorough review and explanation of Dr. Bittner's opinions may not result in a finding of disability, in order to insure compliance with the treating physician rule, reversal and remand is warranted for further proceedings.

**B.**      **Reversal and remand is warranted for a more thorough Step Two analysis**

Parker argues that there is sufficient evidence to demonstrate that his mental health impairments meet the Step Two severity requirement, including Dr. Bittner's opinion evidence. Doc. 14, pp. 18-19.

At Step Two, the claimant must show that he has an impairment that significantly interferes with his ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c).  Basic work activities are the abilities and aptitudes necessary to do most jobs. 20 C.F.R. § 404.1521. Examples of these include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; understanding, carrying out, and remembering simple instructions; use of judgment; and responding appropriately to supervision, co-workers and usual work situations.  *Id.*

---

[19] Since the ALJ provided some, albeit little, weight (rather than no weight) to Dr. Bittner's opinions, the ALJ should have also more clearly explained his RFC assessment which included no restrictions to account for Parker's mental impairments.

Plaintiff carries the burden of proving the severity of his impairments. *Allen v. Apfel*, 3 Fed. Appx. 254, 256 (6th Cir. 2001) (*citing Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988)). Step Two of the sequential evaluation has been construed as a *de minimis* hurdle for a claimant to meet. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1985).  If a "claimant's degree of [mental] limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in" a claimant's "ability to do basic work activities." *Griffieth v. Comm's of Soc. Sec.*, 217 Fed. Appx. 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520a(d))(internal quotations omitted).  The purpose of Step Two is to allow the Commissioner the ability "to screen out 'totally groundless claims'" from a medical standpoint. *Id.*  (citing *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985).  Thus, a claimant's impairment will be construed as non-severe only when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience." *Farris,* 773 F.2d 85 at 90 (*citing Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)).

Here, at Step Two, the ALJ recognized that Parker had medically determinable mental impairments of depression, anxiety, panic disorder, obsessive compulsive disorder, and post-traumatic stress disorder.  Tr.  103.   The ALJ also recognized that Parker's treating psychiatrist and psychologist opined that Parker had marked or extreme difficulties in the areas of activities of daily living, social functioning, and concentration, persistence or pace.  Tr. 103-104. However, the ALJ concluded that, considered singly or in combination, Parker's mental impairments did not cause more than a minimal limitation in his ability to perform basic mental work activities and therefore were non-severe impairments.  Tr. 103.   More particularly, the ALJ

concluded that the record evidence supported a finding that Parker had *no* limitation in the three functional areas of activities of daily living, social functioning, and concentration, persistence or pace.  Tr. 103-104.

Dr. Bittner's opinions included his diagnoses of panic disorder with agoraphobia; major depression, recurrent; and obsessive compulsive disorder.  Tr. 610.  Dr. Bittner also indicated that Parker continued to have severe agoraphobia and panic attacks and opined that Parker had marked restrictions/difficulties in activities of daily living and in maintaining concentration, persistence or pace and extreme difficulties in maintaining social functioning.  Tr. 610, 613. Although the ALJ did not provide controlling weight to Dr. Bittner's opinions, the ALJ did give "little weight" to those opinions (Tr. 107),[20] which is different than no weight.  The ALJ's conclusion that Parker had no limitations in the three functional areas appears inconsistent with the fact that the ALJ provided some, albeit little, weight to Dr. Bittner's opinions.[21] Tr. 107. The ALJ's analysis, although detailed in some respects, is thus insufficient to allow this Court to determine whether the ALJ's Step Two determination, i.e., that Parker's mental impairment claim was "'totally groundless' solely from a medical standpoint," is supported by substantial evidence.[22]  *Mack v. Colvin*, 2013 WL 3935057 *7-8 (S.D. Ohio July 30, 2013) *report and*

---

[20] The ALJ also gave "little weight" to Dr. McIntire's opinion.  Tr. 107 (referencing Exhibit 6F, Tr. 385-394).

[21] The ALJ also afforded great weight to state agency psychological consultants' and consultative examining psychologists' mental assessments wherein the consultants opined that Parker had no or only mild mental limitations. Tr. 107, referencing Exhibits 7F, 8F, 13F, 14F, and 21F.  While those assessments may provide support for the ALJ's Step Two determination, all but one of the assessments pre-date Dr. Bittner's 2010 opinion and none of the assessments post-dates Dr. Bittner's 2011 opinion.

[22] The Commissioner relies in part on *Pierce v. Sec'y of Health & Human Servs.*, 818 F.2d 31 (Table), 1987 WL 37386, *7 (6th Cir. May 14, 1987) to argue that the ALJ's Step Two decision was proper.  Doc. 15, p. 18.  The Commissioner asserts that in *Pierce*, the Sixth Circuit stated, "Appellate courts have frequently upheld administrative decisions based on the conclusion that a non-exertional impairment did not significantly limit exertional capabilities when the medical evidence established that the nonexertional limitation was mild."  Doc. 15, p. 18 (quoting *Pierce*, 1987 WL 37386, * 7).   Since the issue in *Pierce* was whether the ALJ had properly used the grid as a framework for reaching his disability determination and reliance upon the grid is not at issue in this case, the Commissioner's reliance upon is *Pierce* is unpersuasive.  Also, the Commissioner's reliance on *Hendrix v.*

*recommendation adopted,* 2013 WL 4457369 (S.D. Ohio Aug. 20, 2013) (medical opinions finding severe impairments that were credited even in part showed that claimant met the "*de minimis* hurdle").

In some instances, where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, an error at Step Two may not warrant remand.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process).  Here, however, remand is appropriate. *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 190-191 (6th Cir. 2009) (finding reversible error even though the ALJ had found other impairments to be severe). Although the ALJ found other impairments to be severe and proceeded with subsequent steps in the sequential evaluation process, it is not clear that the ALJ actually considered Parker's mental impairments when assessing his RFC.  For example, the ALJ discounted Dr. Bittner's opinions based on his Step Two analysis.  Moreover, the ALJ provided Dr. Bittner's opinions some, albeit little, weight yet the ALJ included no restrictions in the RFC to account for Parker's mental impairments.

Even if the Court were to conclude that the ALJ had sufficiently considered Parker's severe and non-severe impairments when assessing Parker's RFC, since reversal and remand is separately warranted for further analysis of Dr. Bittner's opinions in accordance with the treating physician rule and that analysis may impact later steps of the sequential evaluation process, on remand, there should also be further analysis regarding whether Parker's mental impairments are

---

*Comm'r of Soc. Sec.*, 2012 WL 1048449, * 2 (E.D. Mich. Mar. 28, 2012) (Doc. 15, pp. 18-19) is similarly unpersuasive.  In *Hendrix*, the "claimant did not indicate that she was substantially limited . . . [and] the medical record showed limited treatment for mental impairments and no other indicators of severity."  *Id.* at *2.  In contrast, Parker has claimed that he was limited as a result of his mental impairments and he presented medical opinion evidence that his impairment was severe.

severe and, if not severe, what if any limitations should be included in the RFC to account for his mental impairments.

### VII. Conclusion and Recommendation

For the foregoing reasons, the Commissioner's decision should be **REVERSED** and **REMANDED**.[23]

Dated: July 15, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[23]  On remand, Parker may ultimately be found disabled.  However, this recommendation should not be construed as a recommendation that, on remand, Parker be found disabled.