IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Troy L. Parker,

    Plaintiff,        Case No. 3:13 CV 1810

 -vs-

                MEMORANDUM OPINION
                AND ORDER

Commissioner of Social Security,

    Defendant.

  Troy L. Parker applied for social security disability insurance benefits and supplemental security income benefits with the Social Security Administration. After exhausting his available administrative remedies, the Commissioner of Social Security denied Parker's applications for benefits.

  Parker then sought judicial review of the Commissioner's decision. The case was referred to Magistrate Judge Kathleen B. Burke for findings of facts, conclusions of law, and recommendations. The Magistrate Judge issued a report and recommendation (R&R) recommending I reverse and remand the Commissioner's decision denying Parker's applications for benefits. This matter is before me pursuant to the Commissioner's timely objections to the Magistrate Judge's R&R.

  I have jurisdiction over the Commissioner's final decision denying Parker's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006). In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), I have made a de novo determination of the Magistrate Judge's R&R. For the reasons stated below, I decline to adopt the Magistrate Judge's conclusion of law and affirm the Commissioner's decision denying Parker's applications for benefits.

## I.  STANDARD OF REVIEW

I have conducted a de novo review of the Magistrate Judge's R&R to which the Commissioner objects.  28 U.S.C. § 636(b)(1).  In so doing, I have reviewed the Commissioner's decision to determine whether it is supported by substantial evidence.  42 U.S.C. § 405(g).  I "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  I do not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if I would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted).  The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Id.* at 854–55.

## II.  BACKGROUND

Because the Commissioner has not objected to the Magistrate Judge's factual summary of the case as set forth on pages two through thirteen of the R&R, I adopt the Magistrate Judge's findings.  The Magistrate Judge's uncontested summary of the case is as follows:

### I. Procedural History
On or about April 20, 2010, Parker filed applications for DIB and SSI.[1]  Tr. 45, 57, 100, 169.  He alleged a disability onset date of July 1, 2007.[2] 11, 45, 57, 250.

---

[1] Parker had previously filed for social security disability benefits in 2008 (Tr. 41-42, 187-190) and 2009 (Tr. 43-44, 219-222). Those applications were denied. Tr. 41-42, 43-44, 117-123, 124-130. During the hearing, the Administrative Law Judge ("ALJ") indicated that Parker had made a request to reopen the applications previously filed on May 12, 2008, and February 29, 2009, and that those applications had been reopened. Tr. 11.
[2] During the hearing, the ALJ stated that Parker alleged a disability onset date of May 30, 2008, after initially alleging an onset date of July 1, 2007. Tr. 11. Notwithstanding this statement, in his decision, the ALJ refers to an

2

He alleged disability based on depression, anxiety, panic attacks, and severe neck pain (Tr. 45, 57, 71, 83, 131, 134, 142, 146, 149, 153). After initial denial by the state agency (Tr.131-133, 134-137), and denial upon reconsideration (Tr.142-145, 146-148, 149-152, 153-155), Parker requested a hearing (Tr. 156-160). An administrative hearing was held before ALJ Christopher B. McNeil on December 1, 2011. Tr. 9-40. In his February 1, 2012, decision, the ALJ determined that Parker had not been under a disability from July 1, 2007, through the date of the ALJ's decision. Tr. 97-116. Parker requested review of the ALJ's decision by the Appeals Council. Tr. 8. On June 17, 2013, the Appeals Council denied Parker's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence
### A. Personal, educational and vocational evidence

Parker was born in 1965. Tr. 45, 57, 169. At the time of the hearing, Parker was living with his mother and stepfather. Tr. 17. He had attended regular classes in school and graduated from high school. Tr. 17. Parker worked for Whirlpool as an assembler for approximately 14 years.[3] Tr. 18-19. While at Whirlpool, Parker assembled drums for clothes dryers.[4] Tr. 19. Parker left Whirlpool in July 2007. Tr. 21. He indicated that his job had become too stressful. Tr. 20-21.

### B. Medical evidence[5]

Parker first received mental health treatment in 2002. Tr. 333-337, 340-351. On July 5, 2002, Dr. Lalith K. Misra, D.O., Ph.D., conducted a psychiatric evaluation of Parker. Tr. 334-336. Dr. Misra diagnosed Parker with major depressive disorder, recurrent severe; posttraumatic stress disorder, moderate to severe; and generalized anxiety disorder. Tr.336. Thereafter, on October 22, 2002, he was evaluated by Dr. Bipin Desai, M.D. Tr. 340-341. Dr. Desai's diagnoses included major depressive disorder, moderate, recurrent. Tr. 341. Parker continued treatment with Dr. Desai intermittently through 2007. Tr. 342-350, 643-645, 646-648, 649-652.

On March 29, 2008, Parker presented to the Marion General Hospital complaining that his heart was racing and skipping beats. Tr. 360. Parker reported that his symptoms were aggravated by anxiety. Tr. 360. He reported that he had been taking medication for anxiety and depression but had stopped because he thought he did not need the medication anymore. Tr. 360. Parker was discharged home with an impression of "Palpitations Sinus Tachycardia, Anxiety Reaction." Tr. 360. On May 21, 2008, Parker presented to Marion General Hospital with complaints of chest pain. Tr. 352. An emergency room treatment note indicates that Parker had an "anxiety component [to his] condition." Tr. 356.

On May 30, 2008, Dr. Don McIntire, M.D., completed a Mental Functional Capacity Assessment. Tr. 386-387. Dr. McIntire indicated that Parker was "alert and in contact with the examiner, throughout the examination, with no lapses of attention or confusion." Tr. 387. Dr. McIntire also indicated that Parker "presented

---

alleged onset date of July 1, 2007 (Tr. 100, 102, 108), and the Commissioner in her brief refers to an alleged onset date of July 7, 2007 (Doc. 15, p. 2). Plaintiff does not refer to an alleged onset date in his brief.

[3] His most recent job had been a temporary position at a tax office that involved filing and sorting papers. Tr. 18. That job did not last longer than three months. Tr. 18.

[4] Also, towards the end of his employment with Whirlpool, Parker worked as a trainer, training new employees how to do simple jobs. Tr. 19.

[5] Parker's arguments relate to his alleged mental impairments, with the focus of his arguments being based on the weight the ALJ afforded his treating psychiatrist Dr. Stephen J. Bittner, M.D.

as anxious as he was physically nervous and somewhat tremulous. He worries obsessively about many things, leading to insomnia and accompanied by feelings of impending doom . . . He has random panic attacks on almost a daily basis. These worsen in severity and frequency if he is around other people, with the result that he has been isolating himself. He feels depressed and is easily upset and aggravated." Tr. 387. Parker's fund of knowledge was good and his judgment was fair. Tr. 387. Parker reported problems with short-term memory and concentration but not with long-term memory. Tr. 387. As part of the Mental Functional Capacity Assessment, Dr. McIntire rated Parker in 20 categories. Tr. 386. He rated Parker markedly limited in 6 categories; moderately limited in 3 categories; and not significantly limited in 11. Tr. 386. Dr. McIntire checked a box noting that Parker's limitations were expected to last between 30 days and 9 months. Tr. 386.

On August 11, 2008, Dr. Sudhir Dubey, PsyD., conducted a consultative examination. Tr. 395-400. Dr. Dubey opined that Parker had generalized anxiety disorder and indicated that Parker had no work-related mental limitations. Tr. 399-400.

On September 1, 2008, Dr. Caroline Lewis, Ph.D., completed a Psychiatric Review Technique wherein she opined that Parker's mental impairments were not severe. Tr. 402-415. She relied upon Dr. Dubey's consultative opinion noting that it was "the only current acceptable psych source." Tr. 414.

On January 19, 2009, Parker presented to Marion General Hospital complaining of chest pain and anxiety. Tr. 542. Parker reported that he had taken a Xanax but it did not seem to work. Tr. 542. He was discharged home in stable condition with an impression of "Adjustment Disorder w/Anxiety, Atypical Chest Pain." Tr. 542.

On April 28, 2009, Dr. T. Rodney Swearingen, Ph.D., conducted a consultative examination. Tr. 470-474. Dr. Swearingen's diagnoses included depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and posttraumatic stress disorder. Tr. 473. With respect to the four work-related mental abilities, Dr. Swearingen opined that Parker was mildly impaired in his ability to relate to others, including co-workers and supervisors, and in his ability to withstand stress and pressure associated with daily work activity; and he had no impairment in his ability to understand, remember and follow instructions[6] or maintain concentration, persistence and pace. Tr. 473-474.

On May 18, 2009, Dr. Tasneem Khan, Ed.D., completed a Psychiatric Review Technique wherein he opined that Parker's mental impairments were not severe. Tr. 475-489. He opined that Parker had mild limitations in activities of daily living, social functioning, and concentration, persistence or pace. Tr. 485. Dr. Kahn concluded that Dr. McIntire's evaluation was not consistent with the medical evidence and was dated by about one year. Tr. 487. Therefore, he did not provide weight to that opinion. Tr. 487. Dr. Khan also noted that Dr. Dubey had examined Parker and found no limitations. Tr. 487.

On September 16, 2009, Parker presented to Marion General Hospital complaining of chest pains. Tr. 528. Parker was discharged in stable condition with

---

[6] Dr. Swearingen noted that he had not formally assessed Parker's ability to understand, remember and follow instructions but assessed it as not impaired because he had no problems following instructions at his previous job. Tr. 473.

4

the impression of "Chest Wall Pain." Tr. 528.

On November 5, 2009, a licensed social worker with the North Community Counseling Center assessed Parker and completed an Adult Diagnostic Assessment.[7] Tr. 558-565. She summarized that Parker presented with symptoms of depression and anxiety; reported that he felt hopeless, had trouble sleeping, cried for no reason, and lacked an appetite; had suicidal ideation but denied attempts or plans; reported loss of family or friends in a relatively close period of time; reported that he did not like leaving the house, was nervous around crowds, did not like going places alone, had panic attacks and was obsessed with cleaning. Tr. 564. Parker was diagnosed with major depressive disorder, recurrent, moderate and panic disorder with agoraphobia. Tr. 564. Medication and counseling were recommended. Tr. 564.

On December 31, 2009, Parker presented to Marion General Hospital complaining of a racing heart and shortness of breath. Tr. 519. Parker was discharged with an impression of "Palpitations, Premature Ventricular Contractions (PVC), Anxiety Reaction." Tr. 519.

On January 4, 2010, Dr. Stephen Bittner, M.D., completed an Initial Psychiatric Evaluation. Tr. 566-569. Dr. Bittner noted that Parker's mood was depressed and anxious and his affect was constricted. Tr. 568. With respect to whether Parker was aggressive, Dr. Bittner noted "road rage." Tr. 567. Dr. Bittner also noted that Parker was cooperative with no impairment in his cognition, including orientation, memory, attention/concentration and ability to abstract. Tr. 568. With respect to Parker's insight/judgment, Dr. Bittner noted that Parker "knows he's ill & needs treatment." Tr. 568. Dr. Bittner also stated that Parker was neat and pleasant, looked younger than his age, and was eager for help. Tr. 568. Dr. Bittner diagnosed panic disorder with agoraphobia; major depressive disorder, recurrent, and obsessive compulsive disorder. Tr. 568. Dr. Bittner increased Parker's medication. Tr. 569. Dr. Bittner continued to treat Parker through 2011, with Parker reporting some improvement at times but reporting at other times that his condition was worsening. Tr. 570-583, 632-638.

After an August 19, 2010, visit, Dr. Bittner completed a Mental Functional Capacity Assessment wherein he rated Parker in 20 categories. Tr. 548. He rated Parker markedly limited in 9 categories; moderately limited in 8 categories; and not significantly limited in 3 categories. Tr. 548. In the narrative section of the Mental Functional Capacity Assessment, Dr. Bittner noted that Parker was neatly dressed and groomed; his mood was depressed and his affect was constricted; he was highly anxious with severe agoraphobia; he had no intellectual impairment other than poor attention and concentration secondary to anxiety and depression; he had no evidence of thought disorder, paranoia or delusions; and no evidence of substance abuse. Tr. 549.

On September 13, 2010, Dr. Dubey conducted a second consultative examination. Tr. 551-556. His diagnoses included dysthymic disorder and anxiety disorder, not otherwise specified. Tr. 555. He concluded that Parker had no impairment in any work-related mental abilities. Tr. 556.

On October 4, 2010, state agency reviewing psychological consultant Dr. William Benninger, Ph.D., reviewed the record and opined that Parker had affective

---

[7] The licensed social worker's name is not entirely legible. Tr. 564-565. The social worker's last name appears to be Palmer. Tr. 564-565.

5

disorder and an anxiety-related disorder but concluded neither was severe and that Parker had no restrictions in activities of daily living, social functioning, or maintaining concentration, persistence or pace.[8] Tr. 50.

On February 17, 2011, Parker presented to Marion General Hospital complaining of chest pain and was discharged with the impression of "Chest Wall Pain." Tr.593.

On May 27, 2011, Dr. Bittner completed a Mental Impairment Questionnaire. Tr. 610-615. Dr. Bittner noted that he had been treating Parker since January 4, 2010, every 1-2 months. Tr. 610. His diagnoses included panic disorder with agoraphobia; major depression, recurrent; and obsessive compulsive disorder. Tr. 610. He stated that Parker's treatment had included medication and psychotherapy with a fair response but many continuing symptoms. Tr. 610. Dr. Bittner reported that Parker continued to have severe agoraphobia and frequent panic and sub-panic attacks. Tr. 610. He noted that Parker was oriented, not psychotic, and did not suffer from substance abuse. Tr. 610. Dr. Bittner opined that Parker's prognosis was "unclear at this point." Tr. 610. Dr. Bittner identified a number of symptoms on a checklist form, including decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; and emotional withdrawal or isolation. Tr. 611.

Dr. Bittner also rated Parker's mental ability and aptitude to perform various types of work.[9] Tr. 612-614. In the "unskilled work" section, Dr. Bittner opined that Parker had "no useful ability to function" in 5 categories, was "unable to meet competitive standards" in 4 categories, was "seriously limited, but not precluded" in 3 categories, and "limited but satisfactory" in 4 categories." Tr. 612. In the "semiskilled and skilled work" section, Dr. Bittner opined that Parker had "no useful ability to function" in all 4 categories. Tr. 612. In the "particular types of jobs" section, Dr. Bittner opined that Parker had "no useful ability to function" in 4 categories and "limited but satisfactory" ability in 1 category. Tr. 613.

Dr. Bittner also separately rated Parker as markedly limited in his ability to perform activities of daily living and maintain concentration, persistence or pace and extremely limited in maintaining social functioning. Tr. 613. Dr. Bittner opined that, on average, Parker's impairments or treatment would cause him to be absent from work more than 4 days per month and indicated that the restrictions and limitations contained in his assessment were present since 2007. Tr. 615.

C. Testimonial evidence

1. Plaintiff's testimony

Parker testified at the administrative hearing. Tr. 17-34. He indicated that he started seeing a psychiatrist around 2002, shortly after his dad had died. Tr. 21. He was feeling very down and depressed. Tr. 21-22. He did not have very many friends. Tr. 22.

At Whirlpool, he was a team leader and his supervisor was always on him if they were not meeting production. Tr. 20-21. He eventually became so stressed and

---

[8] On February 3, 2011, state agency reviewing psychological consultant Dr. Paul Tangeman, Ph.D., offered an opinion similar to that of Dr. Benninger. Tr. 76.

[9] The form used to rate Parker's ability and aptitude contains three sections: I - Mental abilities and aptitudes needed to do unskilled work; II - Mental abilities and aptitudes needed to do semiskilled and skilled work; and III - Mental abilities and aptitudes to do particular types of jobs. Tr. 612-613. In Section III, there is no description of "particular types of jobs." Tr. 613.

6

nervous that he was not showing up for work. Tr. 20-21, 23. Also, while working, he would get in arguments with co-workers a couple of times a week over little things. Tr. 34. To relieve some of his anxiety and stress, his doctor would take him off work for a week or two and sometimes for three weeks. Tr. 22. Whirlpool accommodated his doctor's request for time off. Tr. 23. Even with the ability to take some time off because of his stress and anxiety, Parker stopped working in 2007. Tr. 23.

With respect to his depression, Parker indicated that he often has no desire to do anything. Tr. 23-24. He is not interested in anything. Tr. 24. He stated that he could not remember the last time he laughed about something. Tr. 24. He is just very unhappy with himself and feels as though he has wasted his life. Tr. 24, 32-33. He has never really done anything that he has wanted to do. Tr. 24, 32-33. He has crying spells on a daily basis. Tr. 24. He has had suicidal thoughts. Tr. 32-33. Parker does not like being around crowds because he starts having panic attacks. Tr. 24-25. Usually, he only leaves the house to attend doctor appointments or go to the Post Office. Tr. 24. Sometimes he joins his mother for a walk through the park. Tr. 24. When he gets panicky, his palms get sweaty, his heart races, he is short of breath, and he feels lightheaded. Tr. 25. He has panic attacks usually every two to three days. Tr. 25. If he avoids crowds, he still might have panic attacks but they are real mild. Tr. 25.

He has a difficult time sleeping. Tr. 26. He is able to fall asleep but only sleep for about an hour or two and then has trouble falling back asleep. Tr. 26. Medication that his doctor has prescribed to help him sleep has worked pretty well but he is still not able to sleep all the way through the night like he used to. Tr. 26.

Parker has gone to the emergency room on different occasions because he felt like he was having a heart attack. Tr. 27-28. At different times, his heart was really racing, he was really short of breath and lightheaded, and felt like he was going to pass out. Tr. 27. His family doctor, Dr. Aurora, sent Parker to a neurologist to have an EEG done. Tr. 26, 28. His doctor advised him that the EEG was okay and that his anxiety was causing his symptoms. Tr. 28.

Parker has also been diagnosed with obsessive compulsive disorder. Tr. 28. Parker indicated that he is a clean freak. Tr. 28-29. He does not like touching doors that a lot of other people have touched. Tr. 29. He usually carries a handkerchief in his pocket and is constantly washing his hands. Tr. 29.

He takes a number of different medications for his mental impairments, including Effexor, an anti-depressant; Xanax for his anxiety and panic attacks; Clonidine to help him sleep; and Temazepam for insomnia.[10] Tr. 31. Some of his medications make him feel lightheaded, dizzy, and/or spaced out or unable to focus. Tr. 31.

In addition to discussing his mental impairments, Parker discussed his neck problems. Tr. 29. He reported that he first started having neck problems about six or seven years prior to the hearing. Tr. 29. The pain starts around the back of his ear and goes about halfway down the middle of his neck and shoulder. Tr. 30. He described the pain as a dull pain, like a really hard grip on his neck and shoulder. Tr. 30. Because of his neck pain, he does not drive a lot. Tr. 30. He started receiving chiropractic treatment and then started going to the Polaris Orthopedic Spine Center for injections. Tr. 29. The injections relieved his pain a little but the pain would come

---

[10] He also takes a blood pressure medication. Tr. 31.

back after about a month. Tr. 29. He indicated that his neck hurts all the time. Tr. 29. Sometimes he takes regular aspirin or Tylenol for the pain but he does not take anything else because he is allergic to a lot of things. Tr. 29-30. For example, he is allergic to Ibuprofen and morphine. Tr. 29.

Parker described a typical day as waking up; having some decaffeinated coffee; reading the newspaper at the dining room table; washing dishes, if they need to be washed; watching some television; and reading. Tr. 32. His stepfather usually mows the lawn. Tr. 32. He likes to cook and, before his depression, anxiety and neck pain, he used to cook a lot more than he does now. Tr. 32. Now, he cooks simple meals once in a while. Tr. 32.

### 2. Vocational expert's testimony

Vocational Expert George W. Coleman, III ("VE") testified at the hearing. Tr. 34-39. The VE described Parker's past work as including work as (1) a file clerk, a semi-skilled, light level position; and (2) assembly worker inspector, an unskilled, light level position.[11] Tr. 36-37.

For the first hypothetical, the ALJ asked the VE to assume an individual with the same education and past relevant work as Parker who can occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; push or pull to the same extent using hand or foot controls; stand or walk about 6 hours and sit about 6 hours in an 8-hour workday; and cannot climb ladders, ropes, or scaffolds. Tr. 37-38. The VE indicated that the described individual would be able to perform both of Parker's past jobs. Tr. 38.

For the second hypothetical, the ALJ asked the VE to add the following limitations to the first hypothetical due to mental impairments – the work must be simple and repetitive, requiring sustained attention for periods of up to 2 hour segments, with not more than occasional contact with supervisors, coworkers or the general public, and without fast-paced or strict time production pressures. Tr. 38. With those additional limitations, the VE indicated that the described individual would be unable to perform Parker's past jobs. Tr. 38. The VE also indicated that, with those mental limitations, the described individual would be unable to perform the essential functions of unskilled, sedentary work. Tr. 38-39.

For the third hypothetical, the ALJ asked the VE to assume an individual who can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; push or pull to the same extent using hand or foot controls; stand or walk about 6 hours and sit about 6 hours in an 8-hour workday; cannot climb ladders, ropes, scaffolds; cannot stoop more than occasionally; cannot climb ramps or stairs more than frequently; cannot kneel, balance, crouch or crawl more than frequently; and cannot bilaterally reach overhead more than occasionally. Tr. 39. The VE indicated that Parker's past work would not be available to the described individual. Tr. 39. However, there were other unskilled positions that the individual could perform, including (1) laundry aid, an unskilled, light level position with 1,211 jobs available regionally and 239,950 available nationally; (2) storage facility rental clerk, an unskilled, light level position with 990 jobs available regionally and 147,450

---

[11] Based on Parker's hearing testimony, the VE indicated that Parker performed the assembly worker position at the light level. Tr. 37. However, the VE noted that, based on information in the written record, he would opine that Parker performed that position at the medium level. Tr. 37 (noting that Exhibit 3E showed that the heaviest weight Parker lifted while performing the assembly worker position was 50 pounds).

8

nationally; and (3) mail sorter, an unskilled, light level position with 305 jobs available regionally and 29,580 nationally. Tr. 39.

***[12][13]

### IV. The ALJ's Decision

In his February 1, 2012, decision, the ALJ found that:[14]

1. Parker meets the insured status requirements through June 30, 2013. Tr. 102.
2. Parker has not engaged in substantial gainful activity since July 1, 2007, the alleged onset date. Tr. 102.
3. Parker has the following severe impairments: degenerative disc disease of the cervical spine and stable angina. Tr. 102. The following impairments are non-severe: obstructive lung defect, emphysema, chronic tension headaches, depression, anxiety, panic disorder, obsessive compulsive disorder, and post-traumatic stress disorder. Tr. 103-105. 4. Parker does not have an impairment or combination of impairments that meets or medically equals a listed impairment, including Listings 1.04 (Disorders of the Spine), 12.04 (Affective Disorders), and 12.06 (Anxiety-related disorders). Tr. 105.
5. Parker has the RFC to perform light work with the following abilities and limitations: (1) able to lift or carry 20 pounds occasionally and 10 pounds frequently; (2) able to push or pull to the same extent with hand or foot controls; (3) able to stand or walk for about 6 hours in an 8-hour workday; (4) able to sit about 6 hours in an 8-hour workday; (5) precluded from climbing ladders, ropes, or scaffolds; (6) limited to no more than occasional stooping; (7) limited to no more than frequent climbing of ramps or stairs; (8) limited to no more than frequent kneeling, balancing, crouching, crawling, and bilaterally reaching overhead. Tr. 105-107.
6. Parker is unable to perform any past relevant work. Tr. 106.
7. Parker was born in 1965, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 107.
8. Parker has at least a high school education and is able to communicate in English. Tr. 107.
9. Transferability of job skills is not material to the determination of disability. Tr. 107.
10. Considering Parker's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Parker can perform, including laundry aide, storage facility rental clerk, and mail sorter. Tr. 107-108.

Based on the foregoing, the ALJ determined that Parker had not been under a disability from July 1, 2007, through the date of the decision. Tr. 108.

(Doc. 17, at 2-15).

### III. THE COMMISSIONER'S OBJECTIONS

The Commissioner objects to the Magistrate Judge's findings regarding the ALJ's treatment

---

[12] Not applicable.
[13] Not applicable
[14] The ALJ's findings are summarized herein.

9

of Parker's treating psychiatrist, Dr. Bittner, and the ALJ's step two finding. Specifically, the Commissioner argues the Magistrate Judge erred because the ALJ reasonably afforded little weight to Dr. Bittner's opinions and provided sufficient reasoning for doing so. In addition, the Commissioner argues the Magistrate Judge erred because the ALJ appropriately found Parker's mental impairments were not severe because they did not cause more than a minimal limitation in his ability to perform basic mental work activities. For the following reasons, I agree with the Commissioner.

Under what is commonly known as the "treating physician rule," an ALJ must give a treating physician's opinion controlling weight if it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating physician's opinion controlling weight, the ALJ must then balance the following factors to determine what weight to give the opinion: 1) the length of the treatment relationship and the frequency of the examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; 4) the consistency of the opinion with the record as a whole; and 5) the specialization of the treating source. *Cole*, 661 F.3d at 937 (citations omitted).

Important here, an ALJ must "'always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion.'" *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). These reasons must be supported by the evidence and must be sufficiently specific to inform any subsequent reviewer of the weight given to the treating source's medical opinion, along with the reasons for that weight. *Id.* (citation omitted).

Here, the Magistrate Judge found that "while the ALJ reviewed, considered and relied upon a significant amount of evidence to support his decision to provide little weight to Dr. Bittner's

10

opinions and find no severe mental impairment, missing from the ALJ's analysis is a discussion of other evidence that is not 'wildly inconsistent' with Dr. Bittner's opinions." (Doc. 17, at 20). However, when carefully read, and taking into account the standards of review, the first portion of the Magistrate Judge's reasoning overwhelms the latter.  It is the Court's function on review to determine whether the ALJ's decision was supported by substantial evidence and whether the ALJ provided "good reasons" for discounting Dr. Bittner's opinions.  I find the ALJ met his burden with respect to both standards.

First, the ALJ expressly afforded great weight to the opinions of Drs. Lewin, Khan, Benninger, and Tangemen because they were consistent with the record.  The ALJ then proceeded to explain that Dr. Bittner's assessments were "wildly inconsistent" with this "same analysis", i.e., the opinions of Drs. Lewis, Khan, Benninger, and Tangemen.  (Tr. 107).  Therefore, the ALJ did provide an explanation with respect to his conclusion that Dr. Bittner's opinions were wildly inconsistent with a variety of identified medical opinions in the record.

The record shows Dr. Bittner's opinions were inconsistent with Drs. Lewin, Khan, Benninger, and Tangemen's opinions.  Specifically, Drs. Lewin, Khan, Benninger, and Tangemen all found Parker's mental impairments were either not severe or mild.  Moreover, these doctors found at most a mild impairment with respect to activities of daily living and little to no difficulty in social functioning and maintaining concentration, persistence, and pace. In contrast, Dr. Bittner found Parker was markedly impaired in these categories and not able to work.

The Magistrate Judge acknowledged the ALJ relied on his step two analysis "as the basis for providing little weight to Dr. Bittner's opinions." (Doc. 17, at 19).  To that end, the Magistrate Judge was aware the ALJ relied on the opinions of state agency and consultative opinions, treatment notes from North Community Counseling, and disability and function reports in affording Dr.

11

Bittner's opinions little weight. (Doc. 17, at 19; Tr. 103-05). This shows the ALJ substantially supported his decision to afford little weight to Dr. Bittner's opinions.

The Commissioner also objects to the Magistrate Judge's finding that the ALJ erred because he referenced only one regulatory factor in discounting Dr. Bittner's opinions – consistency. However, the ALJ also addressed the regulatory factors of supportability and specialty. *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (an ALJ's reasoning for discounting treating physician opinion may be brief so long as it touches upon several of the regulatory factors). Indeed, the ALJ afforded little weight to Dr. Bittner's opinions because they were "wildly inconsistent with and *not supported* by [the opinions of Drs. Lewis, Khan, Benninger, and Tangemen]." (Tr. 107). (Emphasis added.) Moreover, the ALJ considered Dr. Bittner's specialty by specifically noting he was Parker's treating psychiatrist. (Tr. 107). Therefore, I find the ALJ's analysis of the regulatory factors sufficient in affording Dr. Bittner's opinions little weight.

In sum, it appears the Magistrate Judge found the ALJ erred in his treatment of Dr. Bittner's opinions because there was some evidence to support them. For example, despite acknowledging the ALJ "reviewed, considered, and relied upon a significant amount of evidence to support his decision to provide little weight to Dr. Bittner's opinions", the Magistrate Judge pointed to Dr. Desai's treatment notes from 2002, approved work leave requests from 2006 and 2007, and a portion of Dr. McIntire's opinion supporting a contrary conclusion. (Doc. 17, at 20).

The standard I must follow is whether substantial evidence supports the ALJ's determination. *Brainard*, 889 F.2d at 681. Here, the Magistrate Judge recognized the ALJ relied upon a "significant" amount of evidence to support his decision to provide little weight to Dr. Bittner's opinion. I find this evidence was not only significant, but substantial. In addition, I find the ALJ gave sufficiently specific, good reasons for discounting Dr. Bittner's opinions. Accordingly,

12

the Commissioner's objection is well taken with respect to the conclusions of law concerning the ALJ's treatment of Dr. Bittner's opinions.

Finally, the Commissioner objects to the Magistrate Judge's finding that the ALJ erred at step two, i.e., that Parker's mental impairments were not severe. In so finding, the Magistrate Judge relied heavily on the ALJ's treatment of Dr. Bittner's opinions that Parker was markedly limited in a variety of categories. (*See* Doc. 17, at 19, 23-27). The Magistrate Judge concluded the ALJ erred at step two because "it [wa]s not actually clear that the ALJ actually considered Parker's mental impairments when assessing his RFC." (Doc. 17, at 26).

At step two, a claimant must show he has an impairment which significantly interferes with his ability to perform basic work activities. 20 C.F.R. § 404.1527(c). Under Social Security Ruling 96-3p, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996).

While step two is a de minimus hurdle, if a "claimant's degree of [mental] limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [claimant's] ability to do basic work activities." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(d) (internal quotations omitted).

The ALJ concluded Parker's mental impairments were nonsevere because they did not cause more than a minimal limitation in his ability to perform basic mental work activities. (Tr. 103). In doing so, the ALJ spent a significant amount of time rating Parker's degree of limitation in the functional areas prescribed by the regulations: (i) activities of daily living; (ii) social functioning; and (iii) concentration, persistence, or pace. 20 C.F.R. §404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will

13

generally conclude that your impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.").

In discussing activities of daily living, the ALJ noted Dr. Bittner's opinions of marked limitation in this category but found the evidence in the record suggested otherwise. (Tr. 103). The ALJ pointed to testimony which revealed Parker read the newspaper, washed dishes, read "a lot," and cooked; and record evidence showing Parker drove, cared for his dog, did yard work, shopped independently, worked on home projects, used the internet, went bowling occasionally, played piano two to three times per week, went out to eat regularly, mowed the lawn, and went to the park with his parents and friends. (Tr. 103). Finally, the ALJ pointed to four state agency physician opinions which found he had no or mild limitations in this area. (Tr. 103).

With respect to social functioning, the ALJ noted Dr. Bittner's opinions finding Parker was extremely limited in this category. However, the ALJ concluded the record showed Parker consistently reported no issues in dealing with public agencies or neighbors, talking on the phone, shopping, going outside once or twice a day, interacting with others, or going to the park. (Tr. 104). Moreover, the ALJ explained examining and treating mental health care professionals consistently observed Parker was relaxed, cooperative, friendly, and open to conversation. (Tr. 104). The ALJ also pointed to state agency and consultative examiner opinions which found Parker was either not limited or mildly limited in this category. (Tr. 104).

With respect to concentration, persistence, or pace, the ALJ again acknowledged Dr. Bittner's opinions of marked limitation; however, the ALJ pointed to evidence indicating either no or mild limitation in this category. (Tr. 104). For example, Parker reported he read "a lot," had no trouble concentrating, worked on home projects, played piano, and worked on puzzles. (Tr. 104). Further, examining and treating mental health professionals, consultative examiners, and state

14

agency physicians all found Parker was either not impaired or mildly impaired in this category. (Tr. 104).

Therefore, not only did the ALJ adequately explain why Parker's mental limitations were nonsevere according to the regulations, he supported his finding with substantial evidence. Moreover, the ALJ explicitly bolstered his reasoning for affording Dr. Bittner's opinions little weight.

Finally, the ALJ's accordance of "little" rather than "no" weight to Dr. Bittner's assessments did not undermine the ALJ's decision. While the extreme limitations set forth by Dr. Bittner are unsupported and inconsistent with the record, as the ALJ explained, not all of his findings contradicted the ALJ's determination. For instance, Dr. Bittner found Parker had a "limited but satisfactory" ability to understand, remember, and carry out simple instructions; which comports with the ALJ's finding that Parker was only mildly limited with respect to concentration. (Tr. 103-04, 612).

Accordingly, the ALJ did not err with respect to his treatment of Dr. Bittner's opinions or in finding Parker's mental impairments nonsevere.

## IV. CONCLUSION

I decline to adopt the Magistrate Judge's conclusions of law and affirm the Commissioner's denial of Parker's applications for social security disability insurance benefits and supplemental security income benefits.

So Ordered.

      s/ *Jeffrey J. Helmick*
    United States District Judge